UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
BARBARA McKINNEY,                            :
                                             :   06 CV 7199 (CLB) (GAY)
                       Plaintiff,       :
                                             :
    - against -                             :
                                             :
NXP SEMICONDUCTORS USA, INC.,                :
                                             :
                       Defendant.       :
---------------------------------------------------------------x

**DEFENDANT NXP SEMICONDUCTORS USA, INC.'S
LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, defendant NXP Semiconductors USA, Inc. ("NXP"), states that there is no genuine issue to be tried as to any of the following facts.

Phillips and the Fishkill Plant

1. Philips Semiconductors USA, Inc. ("Philips") was an affiliate of Royal Philips Electronics, N.V., a global electronics company with more than 100,000 employees. (Domkiw Aff. ¶ 2)

2. Between 2000 and 2006, Philips operated a semiconductor manufacturing plant in Fishkill, New York. (Domkiw Aff. ¶¶ 1,3)

3. In September 2006, the Fishkill plant became part of NXP. (Domkiw Aff. ¶ 1; Williams ¶ 1)

4. The Fishkill plant employed between 600 and 800 employees. (Domkiw Aff. ¶ 2)

5. As of October 2004, roughly 12% of the Fishkill workforce was African-American and roughly 25% were racial minorities. (Domkiw Aff. ¶ 2, Ex. 1)

6. Before the plant was operated by Philips, it was run by an unrelated joint venture known as MiCRUS and before that by IBM. (Domkiw Aff. ¶ 1)

Nivia Whalen's Employment Background

7. Nivia Whalen performed secretarial and clerical work at the Fishkill plant for more than 20 years. (Whalen Aff. ¶ 1)

8. Whalen provided administrative support to engineers and managers who worked in a building called Building 320. (Whalen Aff. ¶ 2, Incerto ¶¶ 2-3)

9. From 1983 to 1993, Whalen was a regular IBM employee and from 1993 to 1994 she worked through a temporary agency. (Whalen Aff. ¶ 1)

10. In 1995, Whalen was hired by MiCRUS as an administrative employee. (Whalen Aff. ¶ 1)

11. In about October 2000, Philips bought the Fishkill plant from MiCRUS and MiCRUS's Fishkill employees, including Whalen, became employees of Philips. (Domkiw Aff. ¶ 3)

Barbara McKinney's Employment Background

12. Barbara McKinney worked in the Fishkill plant for 14 years as a manufacturing employee. (McKinney Depo. 14:23-15:12)

13. In 1993, McKinney was let go by IBM as part of a reduction in force. (McKinney Depo. 15:12-15)

14. From 1995 to 2000, McKinney worked through a temporary agency in IBM's legal department in Poughkeepsie, New York and then in its procurement department back in Fishkill. (McKinney Depo. 10:17-11:18, Ex. 1.)

15. In 2000, MiCRUS hired McKinney as an administrative assistant in the human resources department at the Fishkill plant. (McKinney Depo. 16:17-17:3, 18:4-8, 18:24-19:2; Domkiw Aff. ¶ 3)

16. In October, 2000, when Philips bought the Fishkill plant from MiCRUS, McKinney became an employee of Philips. (Domkiw Aff. ¶ 3)

17. McKinney's work in the human resources department was supervised by Mary Domkiw, a human resources generalist. (McKinney Depo. 21:7-10; Domkiw Aff. ¶¶ 1,4)

18. McKinney received two performance reviews covering the time she was assigned to the human resources department. (Domkiw Aff. ¶ 4)

19. For work during 2001, Domkiw rated McKinney as meeting expectations and stable -- a midpoint score of "3" on a scale from 1 to 5, and a letter "J" on a more detailed alphabetical scale Philips used at the time. (McKinney Depo. 69:16-70:6, Ex. 4)

20. For work during the portion of 2002 that McKinney was assigned to human resources, Domkiw rated McKinney's performance as below expectations, though improving -- a second-to-worst score of "4" on the 1 to 5 scale, and a letter "G" on the alphabetical scale. (McKinney Depo. 74:25-75:10, Ex. 5)

Robert Incerto Hires McKinney

21. In about September 2002, Philips decided to centralize in its U.S. headquarters in California a number of human resources functions, including a number of McKinney's duties. (Domkiw Aff. ¶ 4; McKinney Depo. 22:2-12, 23:16-24:13)

22. At about the same time, Robert Incerto, the manager of quality for the Fishkill plant, told the human resources department that he was looking for an administrative assistant to replace a recently departed temporary employee. (Incerto Aff. ¶ 4)

23. Steven Miner, then director of human resources at Fishkill, told Incerto that McKinney was available. (Incerto Aff. ¶ 4) Incerto knew McKinney in passing from her work in human resources. (Incerto Aff ¶ 4.)

3

24. Incerto met with McKinney in September 2002 and hired her into the quality department as an administrative assistant, reporting to him. (Incerto Aff. ¶ 4; McKinney Depo. 29:5-30:6)

25. McKinney's main duty was to provide general administrative support, such as scheduling meetings, preparing correspondence, making travel arrangements, ordering office supplies and making photocopies, sending faxes, and making sure the photocopiers, fax machines and printers near her work areas were working. (McKinney Depo. 48:24-49:13; Holley Aff. ¶ 4).

26. McKinney also helped maintain a tool calibration database and an on-line library of written manufacturing procedures. (McKinney Depo. 49:6-13)

Interdepartmental Sharing of Administrative Support

27. Because there were only a handful of administrative employees at the Fishkill plant, both the administrative employees and the employees they supported paid little attention to departmental lines. (Incerto Aff. ¶¶ 2-3; Whalen Aff. ¶ 3; Holley Aff. ¶ 3)

28. Fishkill employees requiring administrative support tended to go to the nearest available administrative employee, regardless of department. (Incerto Aff. ¶¶ 2-3)

29. Even though McKinney was formally assigned to the quality department (which later became known as the customer relations, quality and system applications department), her primary responsibility was to provide administrative support to some of the more than 100 managers and engineers who worked in the engineering wing of Building 320, where her desk was located. (Incerto Aff. ¶¶ 1, 5; McKinney Aff. 29:24-30:6, 51:4-24, 53:2-11, 53:18-54:2, 61:14-62:24)

30. Most of the managers and engineers McKinney supported were formally assigned to the engineering department, although some were in the quality department and some were in

4

ME1 7489440v.1

the manufacturing department. (McKinney Depo., 127:9-18, Ex. 11, 131: 8-132: 21; Holley Aff. ¶ 4; Incerto Aff. ¶¶ 3-5; Whalen Aff. ¶ 4)

31. The other administrative employees worked across departmental lines as well. (McKinney Depo, 127:9-18, Ex. 11, 131: 8-132: 21; Holley Aff. ¶ 3; Incerto Aff. ¶¶ 2-3; Whalen Aff. ¶ 3)

32. For most of the time McKinney reported to him, Incerto worked at the opposite end of Building 320 and the administrative employees closest to his office were Michelle Hill, Cathy Holley, who was executive assistant to a succession of the company executives, and Nivia Whalen, who was an administrative assistant assigned to the manufacturing department. (Incerto Aff. ¶ 3; Holley Aff. ¶ 3; Whalen Aff. ¶ 3)

33. Incerto tended to get most of his personal administrative support from Hill and when Hill was unavailable from Holley or Whalen. (McKinney Depo. 50:12-22; Incerto Aff. ¶ 3)

34. In 2004, when Hill resigned, Incerto received administrative support primarily from Whalen and Holley, who continued to work near his office. (Incerto Aff. ¶ 5).

35. Sometime in early 2005, Incerto and director of engineering, Ron Bartley, moved into the engineering wing of Building 320. (Incerto Aff. ¶ 7)

36. Holley, who was Bartley's executive assistant at the time, moved to the engineering wing with them and began supporting some of the engineers and managers who worked there. (Holley Aff. ¶ 6)

37. Even after Incerto moved into the engineering wing, his office was still significantly closer to Holley's desk than to McKinney's, so Incerto continued to receive most of his administrative support from Holley. (Holley Aff. ¶ 6; Incerto Aff. ¶ 7)

38. Whalen remained in the opposite wing of the building where she primarily supported the managers and engineers of the manufacturing department, including Sandeep Davé and Steve Ruduski, the department co-heads. (Whalen Aff. ¶ 5)

39. Whalen and McKinney and to a lesser extent Holley covered for each other when one of them was out sick or on vacation or overloaded with work. (McKinney Depo. 95:9-21, 96:9-19; Holley Aff. ¶ 5; Whalen Aff. ¶ 4)

40. The main responsibility of Whalen's and McKinney's jobs was the same: provide administrative support to the engineers and managers of the Fishkill plant. (Domkiw Aff. ¶ 7)

Incerto Treats McKinney Fairly for Three Years

41. McKinney reported to Incerto for three years. (McKinney Depo. 21:18-23, 24:23-25:13, 111:14-18.)

42. During the three years McKinney worked for Incerto, she never had any problems with him. (McKinney Depo. 83:20-84:16.)

43. Neither Incerto (nor anyone else at Philips) ever did or said anything that McKinney considered offensive based on race. (McKinney Depo. 88:12-15, 91:16-25.)

44. On the contrary, Incerto recommended McKinney for a promotion from administrative assistant grade 13 to administrative assistant grade 14, which she received in October 2004. (McKinney Depo. 83:11-17; Incerto Aff. ¶ 6)

45. Incerto also supported McKinney for at least two raises and approved her application for tuition reimbursement for classes she was taking at a community college. (McKinney Depo. 88:16-89:2, 85:16-86:7; Incerto Aff. ¶¶ 6-7)

46. As noted, little of McKinney's work was for Incerto directly and he spent relatively little time supervising her work. (McKinney Depo. 50:12-22; Incerto Aff. ¶¶ 5-7)

ME1 7489440v.1

47.  When it came time to prepare McKinney's written performance reviews, Incerto obtained feedback about McKinney from the people she worked for. (Incerto Aff. ¶ 6)

48.  Incerto rated McKinney's performance in 2003 as a "K," meeting expectations and improving -- the highest performance review McKinney had ever received at Philips. (McKinney Depo. 76:25-77:16, 80:18-25, Ex. 7)

49.  For 2004, Incerto rated McKinney's performance as a "J," meeting expectations and stable. (McKinney Depo. 81:8-82:8, Ex. 8)

The Reduction in Force

50.  In December 2004 and January 2005, in an effort to reduce costs, Philips reduced its workforce at the Fishkill plant by over 100 employees. (Arienzo Aff. ¶ 2)

51.  Neither McKinney nor any of the plant's other administrative employees was affected by the December 2004/January 2005 reduction in force. (Domkiw Aff.; McKinney Depo. 92:8-13, 99:5-8)

52.  In about July 2005, the general manager of the Fishkill plant, Wendy Arienzo, in consultation with her executive team, decided to conduct a second reduction in force. (Arienzo Aff. ¶ 2)

53.  Beginning in July 2005, Arienzo, Bartley, Incerto, Davé and Ruduski met to discuss who would have to be let go. (Arienzo Aff. ¶ 2; Davé Aff. ¶ 2; Incerto Aff. ¶ 8)

54.  As the executive staff made decisions about who should be let go, the decisions were passed on to Mary Domkiw, who recorded them on a spreadsheet, along with a wide variety of potentially relevant information about all of the employees who were considered for possible termination. (Domkiw Aff. ¶ 11).

55. In deciding which employees to select for termination, the executive team evaluated each employee's skills and abilities, which were given a numerical score. (Incerto Aff. ¶ 9; Domkiw Aff. ¶ 9, Ex. 6; Davé Aff. ¶ 3)

56. The executive team also considered the employee's performance reviews for 2001, 2002, 2003 and 2004. (Incerto Aff. ¶ 9; Davé Aff. ¶ 3)

57. The executive team used seniority as a tie breaker between employees who were essentially equal in performance. (Incerto Aff. ¶ 9; Davé Aff. ¶ 3)

<u>McKinney Is Selected for Termination in the September 2005 Reduction in Force</u>

58. Most of the executive staff's time and attention were spent discussing the hundreds of engineers and manufacturing employees employed at the Fishkill facility. (Arienzo Aff. ¶ 3; Davé Aff. ¶ 5; Incerto Aff. ¶ 10)

59. At one of the executive team meetings, Davé said that he would need much less administrative assistance following his move from Building 320 into the manufacturing plant itself. (Arienzo Aff. ¶ 3; Davé Aff. ¶ 4; Incerto Aff. ¶ 10)

60. Looking to make cuts wherever they could, the executive team decided to reduce the number of administrative employees by one and to reapportion the administrative work among the remaining administrative employees. (Arienzo Aff. ¶ 3; Davé Aff. ¶ 4; Incerto Aff. ¶ 10)

61. Susan Mustacchio, a human resources director based in San Antonio, Texas who was in Fishkill to provide human resources support, also attended the executive team meeting at which the executive team decided to terminate an administrative employee. (Mustacchio Aff. ¶ 3)

8

62. Plant-wide, there were only four regular administrative employees: Venuto, executive assistant to Arienzo; Holley, executive assistant to Bartley; Whalen, an administrative assistant assigned to the manufacturing department; and McKinney. (Domkiw Aff. ¶ 7)

63. Philips had also been contracting with a temporary agency for about a year for the services of an administrative employee named Cora Sita. (Domkiw Aff. ¶ 7)

64. As a temporary employee, Sita was not included in Philips' employee headcount for purposes of the September 30, 2005 reduction in force. (Domkiw Aff. ¶ 7)

65. Neither Venuto nor Holley was ever seriously considered for termination. (Arienzo Aff. ¶ 4; Incerto Aff. ¶ 11)

66. Venuto and Holley worked personally for the highest ranking executives at the facility and were in a higher job family than Whalen and McKinney -- executive assistants rather than administrative assistants. (Arienzo Aff. ¶ 4; Incerto Aff. ¶ 11)

67. In any event, both Venuto and Holley had better performance reviews than McKinney or Whalen. (Domkiw Aff., ¶¶ 8-10, Exs. 2-6; Arienzo Aff. ¶ 4, Davé Aff. ¶ 5; Incerto Aff. ¶ 11)

68. Venuto and Holley had all "N"s (exceeds expectations and stable) and "O"s (exceeds expectations and improving.) (Domkiw Aff., ¶¶ 8-10, Exs. 2-3)

69. As between Whalen and McKinney, the only two administrative employees who were plausible candidates for termination, Whalen received a slightly higher score for overall skills -- a total score of 22 as compared with 20 for McKinney. (Arienzo Aff. ¶¶ 4-5; Davé Aff. ¶ 5; Incerto Aff. ¶ 12; Domkiw Aff. ¶10, Ex. 6)

70. Whalen also had slightly better written performance reviews than McKinney for the period 2001 to 2004. (Domkiw Aff. ¶10, Exs. 4-5)

71. On an alphabetical scale ranging from a lowest possible rating of "A" to a highest possible rating of "S," Whalen had three "J"s (meets expectations and stable) and one "K" (meets expectations and improving). (Domkiw Aff. ¶10, Ex. 4)

72. McKinney had three "J"s and one "G" (below expectations but improving). (McKinney Dep. 69:9-71:22, 74:25-77:16, 80:18-82:22, Exs. 4, 5, 7 & 8; Domkiw Aff. ¶10, Ex. 5)

73. However, neither Incerto nor any of the other executives considered these differences significant enough to distinguish McKinney's and Whalen's performance. (Arienzo Aff. ¶ 5; Incerto Aff. ¶ 12)

74. Because Whalen's and McKinney's performance and skills were considered essentially a tie, the executive team looked to seniority as a tie-breaker. (Arienzo Aff. ¶ 5; Incerto Aff. ¶ 12)

75. Whalen had significantly greater seniority. (Arienzo Aff. ¶ 5; Davé Aff. ¶ 5; Incerto Aff. ¶ 12)

76. Whalen's service date was November 13, 1995, giving her almost 10 years of seniority. (Whalen Aff. ¶ 1; Domkiw Aff. ¶ 3)

77. McKinney's service date was April 24, 2000 -- only about half as long a tenure. (Domkiw Aff. ¶ 3)

78. Venuto had more than 30 years seniority and Holley had 10 years seniority. (Domkiw Aff. ¶ 7)

79. Based on Whalen's significantly greater seniority, Incerto recommended that McKinney be selected for termination. (Arienzo Aff ¶ 5; Incerto Aff. ¶ 12)

80.   The other executives involved in the discussion agreed with Incerto's recommendation to terminate McKinney on the basis of seniority. (Arienzo Aff. ¶ 5; Incerto Aff. ¶ 12; Mustacchio Aff. ¶ 4)

81.   McKinney's selection for termination was added to Domkiw's spreadsheet. (Domkiw Aff. ¶ 11, Ex. 7)

82.   That some of the individuals Whalen had been supporting were moving and would need less of her support was not a factor in the executive team's choice between Whalen and McKinney. (Arienzo ¶¶ 3-5; Incerto Aff. ¶ 13)

83.   The executive team viewed Whalen and McKinney as interchangeable and the administrative work of the plant as fungible. (Arienzo Aff. ¶¶ 4-5 ; Incerto Aff. ¶ 13; Mustacchio Aff. ¶ 4-5)

84.   Just as the executive team compared manufacturing employees head to head even though they worked on different shifts and in different parts of the manufacturing process, the executives compared McKinney and Whalen, both administrative assistants, and finding performance factors essentially equal, decided to keep Whalen because of her greater seniority. (Arienzo Aff ¶¶ 3-5.; Incerto Aff. ¶ 13; Mustacchio Aff. ¶ 5)

The ETOC Approves McKinney's Termination

85.   As of 2005, it was the practice at Philips to submit all involuntary terminations, whether in connection with a reduction in force or not, for review and approval by a committee called the Employee Termination Oversight Committee, usually referred to as "the ETOC." (Williams Aff. ¶ 2; Bibeault ¶ 3)

86.   The ETOC consisted of Philips' nationwide Vice President of Human Resources, several directors of human resources from locations around the country, Philips' equal

employment opportunity officer and a Philips in-house lawyer. (Mustacchio Aff ¶ 1; Williams Aff. ¶ 2)

87. The purpose of the ETOC's review was to ensure the fairness and reasonableness of each termination decision. (Mustacchio Aff ¶ 1; Williams Aff. ¶ 2)

88. Before the formal ETOC review of the proposed September 2005 reduction in force decisions, Judee Williams -- Philips' equal employment opportunity officer and Chair of the ETOC -- reviewed a preliminary spreadsheet reflecting the planned terminations. (Williams Aff. ¶¶ 3-4)

89. Williams provided feedback to human resources personnel in Fishkill, verbally and in writing. (Williams Aff. ¶ 4)

90. Specifically addressing the selection of McKinney as the administrative employee to be let go, Williams noted that McKinney and Whalen were in the same job family (i.e., administrative assistants) and had similar performance scores and ratings. (Williams Aff. ¶ 5)

91. Accordingly, Williams stated, selecting the less senior employee would be acceptable to the ETOC. (Williams Aff. ¶ 5)

92. Williams is African-American. (Williams Aff. ¶ 9)

93. Williams' pre-ETOC feedback regarding the proposed Fishkill terminations is reflected in an outline she created at the time, which she titled "ETOC 101." (Williams Aff. ¶ 4, Ex. 1)

94. In that pre-ETOC outline, Williams wrote: "Both Administrative Assistants have the same PR and very close New Rating (NR) scores. The most junior in seniority is selected, which should pass ETOC." (Williams Aff. ¶ 4, Ex. 1)

ME1 7489440v.1

95. Michelle Bibeault, a human resources director based in New England, also attempted to assist the Fishkill facility in preparing for the ETOC review. (Bibeault Aff. ¶ 2)

96. Bibeault would later transfer to become the human resources director in Fishkill, but as of July through September of 2005, she was providing only interim support. (Bibeault Aff. ¶¶ 1-2)

97. Bibeault's advice regarding the ETOC is reflected in power point slides she created in late July 2005, in which she states: "Employees selected by lowest seniority in a job family will pass ETOC." (Bibeault Aff. ¶ 3, Ex. 1)

98. In late August 2005, an updated spreadsheet describing the proposed Fishkill terminations was officially submitted to the ETOC. (Domkiw Aff. ¶ 12, Ex. 8)

99. The August 2005 updated spreadsheet noted that McKinney's work was to be reassigned to Whalen and Holley. (Domkiw Aff. ¶ 12, Ex. 8)

100. On August 30 and September 1, 2005, the ETOC discussed the proposed Fishkill terminations. (Williams Aff. ¶ 6; Mustacchio Aff. ¶ 6).

101. The ETOC approved McKinney's termination, subject to the condition that a temporary administrative employee also be let go and that any available part-time administrative work be offered to McKinney. (Mustacchio Aff. ¶ 6; Williams Aff. ¶ 6)

102. The ETOC also noted McKinney's years of experience as a manufacturing employee. (Mustacchio Aff. ¶ 6; Williams Aff. ¶ 6)

103. Even during a reduction in force, Philips was always looking for good experienced manufacturing employees, so the ETOC suggested that McKinney be offered a manufacturing position. (Mustacchio Aff. ¶ 6; Williams Aff. ¶ 6; Incerto Aff. ¶ 16)

13

104. Given the similarity of McKinney's and Whalen's work, and the established pattern of employees ignoring departmental lines in seeking and providing administrative support both the Fishkill executive team and the ETOC viewed the two employees as interchangeable and saw the change as a simple reduction of the number of Fishkill administrative assistants from two to one. (Arienzo Aff. ¶¶ 3-5; Incerto Aff. ¶¶ 2-3, 13, 19; Mustacchio Aff. ¶ 5; Williams Aff. ¶ 5)

105. During the same September 2005 reduction in force in which McKinney was terminated, the ETOC approved the termination of three white manufacturing operations supervisors out of a group of 22, where the terminated supervisors were selected based on seniority. (Williams Aff. ¶ 7)

106. In the end, two of the three manufacturing operations supervisors were demoted rather than terminated. (Domkiw Aff. ¶ 13)

Incerto Breaks the New to McKinney

107. On September 6, 2005, Incerto told McKinney that she had been selected for termination effective September 30, 2005. (Incerto Aff. ¶ 15; McKinney Depo. 106:19-107:9.)

108. Incerto told McKinney further that Davé and Ruduski no longer needed Whalen as their administrative assistant and that Whalen would be taking over McKinney's responsibilities. (Incerto Aff. ¶ 15; McKinney Depo. 107:5-9, 15-16.)

109. Incerto told McKinney that the decision to terminate her rather than Whalen was based not on performance but on Whalen's greater seniority. (Incerto Aff. ¶ 15; McKinney Depo. 107:11-16, 107:14-108:3.)

110. In the termination meeting, Incerto offered McKinney two options to continue working at Philips: a full-time manufacturing position and a part-time mail room position. (Incerto Aff. ¶ 16; McKinney Depo. 107:16-21.)

111. McKinney told Incerto she was not interested in either position. (Incerto Aff. ¶ 16; McKinney Depo. 116:22-117:14.)

112. The manufacturing position would have paid more in total and more per hour than the administrative assistant position from which McKinney was being terminated. (Incerto Aff. ¶ 16)

## Whalen and McKinney Divide Up McKinney's Work

113. After being informed of McKinney's departure, Whalen and Holley met to discuss how to divide up McKinney's work. (McKinney Depo. 123:15-20; Holley Aff. ¶ 7; Whalen Aff. ¶ 6)

114. Whalen took over the bulk of McKinney's duties but she did not take over responsibility for maintaining the tool calibration database. (Whalen Aff. ¶ 7)

115. Whalen also continued to support some of the managers and engineers from the manufacturing department. (Whalen Aff. ¶ 7)

116. Although Holley remained primarily responsible for supporting Bartley, she also began supporting some of the engineers and managers in the engineering wing of building 320 whom McKinney had been supporting. (Holley Aff. ¶ 7)

117. In early to mid-September, Whalen moved to the engineering wing. (Whalen Aff. ¶ 6)

118. Incerto was now much closer to Whalen than Davé and Ruduski were and became her supervisor. (Incerto Aff. ¶ 17; Whalen Aff. ¶ 6)

119. McKinney explained to Whalen the portions of McKinney's job with which Whalen was not already familiar, primarily ordering office supplies and maintaining the document control and tool calibration databases. (McKinney Depo. 125:4-10; Whalen Aff. ¶ 6)

## McKinney Protests Her Termination

120. Between September 6, 2005 and September 30, 2005, McKinney protested her termination to several human resources employees and Fishkill executives. (McKinney Depo. 112:9-113:5, 134:7-16.)

121. McKinney requested a copy of a written policy that authorized Philips to consider seniority. (McKinney Depo. 121:4-122:5.)

122. On September 16, 2005, Domkiw gave McKinney a copy of a Philips' reduction in force policy. (Domkiw Aff. ¶ 14, Ex. 10)

123. Domkiw gave McKinney the reduction in force policy because McKinney insisted on seeing a written policy that authorized consideration of seniority. (Domkiw Aff. ¶ 14, Ex. 10)

124. In deciding which employees should be let go, the Fishkill executive staff had not used or even seen the Philips reduction in force policy. (Arienzo Aff. ¶ 6; Incerto Aff. ¶ 14)

125. The reduction in force policy stated that employee selections were discretionary and expressly endorsed consideration of seniority. (Domkiw Aff. ¶ 14, Ex. 10)

126. On September 26, 2005, Williams spoke to McKinney about the Philips' reduction in force policy and apologized for a typographical error in the policy. (Williams Aff. ¶ 8)

127. McKinney's employment ended on September 30, 2005. (McKinney Depo. 111: 14-18)

McKinney's Refusal to Explore Opportunities to Return

128. Within several months after McKinney's departure, Domkiw contacted McKinney about an administrative position in Fishkill working for another Philips affiliate. (Domkiw Aff. 15; McKinney Depo. 135:23-138:4)

129. McKinney declined to pursue the opportunity because she felt that it posed "a conflict of interest" with her lawsuit against the company. (Domkiw Aff. ¶ 15; McKinney Depo. 135:23-139:5)

130. At some point in early 2006, Whalen informed Incerto that she intended to retire at the end of the year. (Incerto Aff. ¶ 18; Whalen Aff. ¶ 8)

131. Philips decided to contract with a temporary firm for an employee who could work with Whalen for six months before her retirement and then replace Whalen as a regular Philips employee after Whalen retired. (Domkiw Aff. ¶ 16)

132. In about March 2006, with Incerto's blessing, Domkiw contacted McKinney, told her about the opportunity and urged her to apply. (Domkiw Aff. ¶ 16)

133. McKinney declined to pursue the opportunity. (Domkiw Aff. ¶ 16; McKinney Depo. 143:6-20)

134. Since then, NXP has contacted McKinney about another opportunity to rejoin the Company in an administrative position. (Domkiw Aff. ¶ 17)

135. McKinney has refused to consider this opportunity also. (McKinney Depo. 138:12-18)

136. In October 2004 (i.e., before the two reductions in force), the Fishkill plant had 771 employees, 96 of whom were African-American, a percentage of about 12%, and in October 2005 (i.e., after the two reductions in force), the plant had 660 employees 86 of whom were African-American, a slightly higher percentage than before. (Domkiw Aff. ¶ 2, Ex. 1)

137. In early to mid-2007, after interviewing other candidates, all of whom were white, Incerto hired Kyria Roundtree to work as an administrative assistant based in the engineering wing of Building 320. (Incerto Aff. ¶ 20)

138.  Roundtree is African American. (Incerto Aff. ¶ 20)

139.  Incerto did not request or receive any legal advice before hiring Roundtree; he hired her because he thought she was the best candidate for the job. (Incerto Aff. ¶ 20)

Dated: June 27, 2008

McCARTER & ENGLISH, LLP

By: /s/ Patrick J. Bannon
Patrick J. Bannon (admitted pro hac vice)
265 Franklin Street
Boston, MA 02110
617-449-6529
617-607-9134
pbannon@mccarter.com

Patrick Collins (PC-4182)
Aimée Sato (AS-5309)
245 Park Avenue
New York, New York 10167
212 609-6800
212 609-6921 facsimile
pcollins@mccarter.com
asato@mccarter.com

Attorneys for Defendant
NXP Semiconductors USA, Inc.

ME1 7489440v.1

**CERTIFICATE OF SERVICE**

I, Patrick J. Bannon, certify that on June 27, 2008 I served the above Defendant NXP Semiconductors USA, Inc.'s Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment via electronic transmission through the CM/ECF system on counsel for plaintiff, Ethan York Leonard, who is registered to receive service through the CM/ECF system.

/s/ Patrick J. Bannon
Patrick J. Bannon
